## SPLITDORF ELECTRICAL CO. v. WEBSTER ELECTRIC CO.

(Circuit Court of Appeals, Seventh Circuit. February 5, 1921. On Rehearing, May 8, 1922.)

### No. 2769.

1. Patents ⬤=213—Reserved right in license contract held assignable.

Under a contract, made binding on the "assigns" of each party, by which patentees granted a shop right and license, agreeing not to grant shop rights to others, but reserving the right to themselves to make, use, and sell the inventions, such reserved right *held* assignable.

2. Patents ⬤=328— 1,280,105, for an electrical ignition device, claims 7 and 8, held invalid; claim 3 not infringed.

The Kane patent, No. 1,280,105, for an electrical ignition device for internal combustion engines, claim 3, *held* not infringed. Claims 7 and 8 *held* void for laches; the claims having been presented by an amendment eight years after filing of the original application and more than nine years after the device was in general use.

### On Rehearing.

3. Patents ⬤=109—Divisional application must be filed within two years after publication of patent covering same claims.

Under Rev. St. § 4886 (Comp. St. § 9430) a divisional application must be filed within two years from the allowance and publication of a patent covering the same claims.

Appeal from the District Court of the United States for the Northern District of Illinois.

Suit in equity by the Webster Electric Company against the Splitdorf Electrical Company. Decree for complainant, and defendant appeals. Reversed, with directions to dismiss the bill.

See, also, Webster Electric Co. v. Podlesak (D. C.) 255 Fed. 907. Certiorari granted 258 U. S. ——, 43 Sup. Ct. 92, 67 L. Ed. ——.

Edward Rector, of Chicago, Ill., and Charles L. Sturtevant and Eugene G. Mason, both of Washington, D. C., for appellant.

Livingston Gifford, of New York City, for appellee.

Before BAKER, EVANS, and PAGE, Circuit Judges.

EVAN A. EVANS, Circuit Judge. The present appeal involves three patents, the determination of two of which, Nos. 1,101,956 and reissue No. 13,878, turns upon a certain agreement made between the patentees, Henry and Emil Podlesak, and appellee. The assignable rights of the patentees in these two patents were, prior to the commencement of this suit, assigned to appellant.

The Podlesaks entered into two license agreements with appellee on the same date, February 5, 1914. These contracts were subsequent to

other contracts made between the same parties and out of which difficulties had arisen. One of these simultaneously executed agreements deals with six patents, two of which are the ones above enumerated, and in which alone we are concerned. The other agreement was an exclusive license contract affecting other patents, none of which are before us. The latter contract, therefore, is of importance only as it may bear on the construction of the one under consideration. The so-called "license agreement (shop right)" is in part set forth at the bottom of this opinion for reference sake.[1] The difference between counsel is

---

[1] License Agreement (Shop Right).

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

And whereas, the party of the second part is desirous of securing a shop right and license to manufacture, use, and sell the inventions and improvements, described and claimed in above said patents, and applications for patents, all or any one of them, the validity of which patents, granted or to be granted, is admitted, and to bring and maintain suits against infringers of the patent rights covering the said inventions, within and throughout the United States of America and territories thereof, and for and during the life of any and all of the patents, and patents that may be granted, on any of the applications described below, or any of them:

Now, therefore, in consideration of one dollar ($1.00) by the party of the second part to the parties of the first part, in hand paid, and of the covenants and agreements of the party of the second part, hereinafter expressed and to be kept and performed, the parties of the first part do hereby grant unto the party of the second part a shop right and license to manufacture, use, and sell the inventions or improvements, and each and every one of them, described, set forth and claimed in said patents, Nos. 1,022,642, 1,055,076, and 1,056,360, and said applications, serial Nos. 734,143, 668,153, and 639,738, and any division or divisions thereof within and throughout the United States of America and territories and possessions thereof, for and during the term of said patents or any of them; and the parties of the first part agree that they have good right and lawful authority to grant said shop right and license, and that they have not heretofore parted with any right, license, or privilege inconsistent therewith, and that they will not, while this shop license to the party of the second part is in force give or grant shop licenses to others to make, use, or sell hereinsaid inventions, expressly reserving, however, the right to themselves to make, use and sell the hereinsaid inventions.

Second. The parties of the first part agree to and with the party of the second part that they and each of them, will aid and assist each other in the prosecution of said applications and the obtaining of patents thereon and in any interference proceeding relating to their right of priority to said inventions, and in any suit or proceeding brought under any of the said patents or for the infringement of any patents by reason of the manufacture, use, or sale by the party of the second part of the inventions described in said patents or applications: Provided, however, that said parties of the first part shall not be called upon to pay out or expend any money in any suit or proceeding relating to the said inventions, and the parties of the first part hereby appoint the attorney for the party of the second part as their agent and attorney for the purpose of joining them as parties complainant where necessary or desirable, in any suit which the party of the second part may wish to bring on account of the infringement of any of said letters patent or any patent which may be granted upon their aforesaid applications, the said attorney for the party of the second part to have the power to execute as the attorney and agent of the parties of the first part any papers which may be necessary or convenient to the commencement and maintenance of any such suit; it being expressly understood and agreed, however, that the parties of the first part are not to be put to any expense or to be required to expend any moneys, on account of any such infringement suits to which they

limited to the assignable rights of the Podlesaks. The trial judge accepted the urge of appellee, and found from the entire agreement an intention to deny to the patentees any assignable reserved right to make and sell the patented articles.

Prior to entering into this agreement, patentees had the unlimited

may be made parties complainant, and it is expressly understood and agreed, further, that the said parties of the first part shall be exempt from liability in damages or court costs resulting from any lawsuits in which the parties of the first part may thus be joined with the party of the second part, the party of the second part agreeing to assume the payment of any and all damages and court costs that may result from any such suits.

   *       *       *       *       *       *       *       *       *       *

Sixth. The party of the second part agrees that it will, except as hereinafter provided, use any devices manufactured under this shop license only in connection with, or for repairs to, the device manufactured under license which is covered by the agreement made on February 5, 1914, by which the parties of the first part give to the party of the second part the exclusive and sole right to manufacture ignition devices covered by patents No. 947,647, of January 25, 1910, inductor generators for ignition purposes, No. 949,483, issued February 8, 1910, inductor generators for ignition purposes, and No. 1,003,649, issued September 19, 1911, inductor generators for ignition purposes, and that whenever the devices covered by this shop right and license are made and sold and delivered, not as a part of, or for use in connection with, the devices manufactured and sold under the aforesaid exclusive license dated February 5, 1914, then the party of the second part agrees that it will on the day of each and every report pay to the parties of the first part, jointly as a royalty or license fee, five per cent. (5%) of all moneys or the equivalent thereof, which they may have received or that may be due them from the sales of or in exchange for the devices covered by this shop right and license sold and delivered during the preceding quarter. It is further expressly understood and agreed that the said devices manufactured embodying above improvements, or any of them, are not to be sold for less than a fair and reasonable price, based upon manufacturing and trade conditions.

   *       *       *       *       *       *       *       *       *       *

Eighth. The party of the second part, with the approval, in writing, of the parties of the first part, shall have right to grant shop right or license for the manufacture, use and sale of devices embodying the invention described and claimed in said patents No. 1,022,642 and No. 1,055,076, to makers of, or dealers in, gas engines and gas engine accessories, but such shop rights or licenses so granted by the party of the second part shall be on and with the same terms and limitations as hereinbefore set forth, namely, that the devices made under such shop right license shall be used only in connection with, or for repairs for or to, devices made under the hereinbefore mentioned patents No. 947,647, 948,483, 1,003,649, and 1,056,360, and any patents that may be granted on the hereinbefore mentioned applications serial Nos. 734,143, 668,153, and 639,738, or any of them and in no other way. The parties of the first part may approve any such shop right or license to be granted by the party of the second part either personally or by attorney, or agent.

Ninth. The party of the second part agrees that it shall not permit or encourage other parties to manufacture, use, or sell devices covered by hereinbefore mentioned patents, or patents that may be granted on hereinsaid applications, or any of them, except as and on terms and limitations hereinbefore set forth, relative to said shop licenses under patents No. 1,022,642 and No. 1,055,076. It is further agreed and understood that this shop license becomes terminated in the case of event the license given in the said agreement of February 5, 1914, becomes terminated by manner therein provided for.

Finally. It is agreed that this agreement shall extend to and be binding upon the heirs, assigns, and legal representatives of the parties of the first part, and the successors and assigns of the party of the second part.

right to make and sell their patented articles, and this right was of course assignable in whole or in part. They likewise had the right to exclude all others from making or selling the articles. To what extent were these rights restricted, if at all, by this agreement? The precise language of the contract is significant. After first reciting that appellee "is desirous of securing a *shop right* and license to manufacure, use and sell the invention," it provided by its only granting clause "that patentees do hereby grant unto the party of the second part a *shop right* and license to manufacture, use, and sell the inventions * * * set forth and claimed in said patents." The patentees further agreed, and this is significant, because it is this agreement that appellee relies upon in support of its contention, that they, "will not * * * give or grant *shop rights to others* to make, use, or sell hereinsaid inventions." Patentees immediately thereafter provided as follows: "Expressly reserving, however, the right to themselves to make, use, and sell the hereinsaid inventions." After numerous other provisions, "it is agreed that this agreement shall extend to and be binding upon the heirs, *assigns*, and legal representatives of the party of the first part, and the successors and *assigns* of the party of the second part."

We have, then, a contract, the legal effect and the express provisions of which provide for patentees' right to manufacture and sell, and further that such rights as patentees reserved are expressly made assignable. It would therefore seem to follow inevitably that appellant, by its purchase of patentees' rights, acquired the right to make and sell the patented articles. But appellee stresses the provision (paragraph No. 8) as well as the provision found in paragraph No. 3, contending that covenant 8 negatives any intention to reserve any assignable right to make and sell the patented articles.

[1] We are, however, unable to draw any deductions from paragraph 8 favorable or unfavorable to appellee. This provision added nothing to the rights of either party. It was surplusage; for certainly new or added agreements might be made respecting shop rights or other licenses, provided the parties agreed to them in writing. As to covenant No. 3, we see nothing absolutely inconsistent between it and the assignability clause of the agreement, while there is a fatal inconsistency between such assignability clause and appellee's position. For assignment by patentees of all their rights, including the right to make and sell, is not necessarily inconsistent with the assignor's agreement not to execute a shop right to others. The court's duty, if possible, is to reconcile the two provisions and give effect to both. At least, in any doubtful case, the express provision authorizing assignment must control over a negative agreement which at best only inferentially questions patentees' right to assign their right to make and manufacture.

But further reasons for such conclusion appear. Why did the parties make two agreements, instead of one? If the parties intended to give an exclusive license as to some patents, and to reserve, as to others, merely the right to make and manufacture the article, it could have been easily so provided and in a single agreement. Why did the parties so carefully throughout the agreement refer to appellee's grant as a "shop right"? If appellee's position be tenable, it secured more than a shop

right; it secured an exclusive license, excepting only that patentees reserved the mere personal nonassignable right to make the article. Further queries are suggested. If appellee's position is tenable, would the reserved right to make and sell die with the parties? Could the parties exercise the right as copartners, or as a corporation wherein they were the sole stockholders? If one wished to exercise the right, and the other did not, were their hands tied?

While we are satisfied that an examination of the contract as heretofore pointed out leads but to one conclusion, these queries are suggested merely to offer additional reasons for concluding that the parties intended to reserve an assignable right to make and sell the patented article. Again, by paragraph 3, patentees at most merely agreed not to execute to others, *shop rights*. The words "to others" indicate that the parties were contracting with respect to individuals or corporations *other* than the parties to the contract. In assigning their rights to appellant, patentees were not executing shop rights.

Much stress has been laid on the asserted "equities of the case." We are, however, unable to recognize their pertinency. The contract between appellee and patentees was voluntarily executed. It fixed the rights of both parties. Any enhancement in the value of the patent was unquestionably mutually advantageous. Whether patentees were guilty of ingratitude to their former employers in selling the reserved rights in the patent to a business competitor of such employer is beside the question. That certain rights were reserved by patentees is conceded. That such reserved rights as were assignable were sold to appellant is also conceded. As between appellant and appellee, then, the issue is solely and simply a question of the extent of the assignable rights so reserved.

[2] *The Kane Patent.* Numerous defenses to the suit on the Kane patent, No. 1,280,105, are presented. Estoppel, invalidity (based on several grounds), and noninfringement are all set forth and elaborated and ably argued by both counsel. Whether the specifications as originally drawn are sufficient to support claims 7 and 8, inserted some eight years after the application was filed, is a question which we find it unnecessary to determine. Likewise, we are not called upon to disturb the finding of the District Court in favor of Kane and against the Milton patent on the issue of priority. We are likewise not called upon to determine whether appellee is estopped to assert certain contested claims in this patent. We have, in other words, concluded that claims 7 and 8 are invalid for want of patentable novelty. These two claims read as follows:

"7. In an electrical ignition device for internal combustion engines, the combination of a magneto generator comprising rotor and stator and generating winding, a pair of relatively movable make and break spark electrodes adapted to be located within an engine cylinder, spring means tending normally to hold said rotor in a certain position, mechanism whereby the movement of the rotor effects the separation of said electrodes at a predetermined point in the movement of the rotor, *a rigid unitary and integral support upon which all of the aforesaid parts are mounted*, whereby all of said parts may be removed from and returned to their position upon an engine cylinder without disturbing their relations one to another, conductors for carrying electric current from said generating winding to said electrodes, and engine driven

means adapted to oscillate said rotor against the action of said spring means and then to release it.

"8. In an electrical ignition device for internal combustion engines, the combination of a magneto generator comprising rotor and stator and generating winding, a pair of relatively movable make and break spark electrodes adapted to be located within an engine cylinder, spring means tending normally to hold said rotor in a certain position, mechanism whereby the movement of the rotor effects the separation of said electrodes at a predetermined point in the movement of the rotor, a *supporting member upon the several parts of which all of the aforesaid mechanism is mounted and having a single integral part adapted to be attached to the engine,* whereby all of said mechanism may be removed from the engine by removing said single integral part and may be returned to its position upon the engine with unchanged relations between any and all of the parts of all of said mechanism, thereby insuring the predetermined synchronism and interrelated adjustment of said mechanism when it is replaced upon the engine, and engine driven means adapted to oscillate said rotor against the action of said spring means and then to release it."

The italicized words mark the asserted novelty upon which invention is predicated. The claims, read alone and without the background of any prior art, appear impressive. To contribute anything that would tend to produce perfect or more exact synchronism between the separation of the electrodes and the tripping of the magneto armature, and between the production of the spark and the cycle of the engine, may indeed be accepted as prima facie evidence of inventive skill.

But a more thorough study and analysis of these claims, as well as an examination of the specifications and the drawings, discloses that Kane was not dealing with the afore-referred to synchronism as such—was not dealing with the arrangement or the adjustment of the parts of an oscillating magneto, but in respect to these two co-operating parts he merely connected the magneto generator with the igniter block, so that the two might be removed and repaired *as a unitary structure.* True, the removal of such a unitary structure may have made it possible to retain the adjusted relation of the co-operating parts, but it can hardly be said to have in any way affected synchronism as such or the co-operation of the parts of the magneto ignition. Thus explained, without any prior art to enlighten us, it would hardly evidence inventive skill to provide "a rigid unitary and integral support upon which all of the aforesaid parts are mounted," or to provide "a supporting member upon the several parts of which all of the aforesaid mechanism is mounted, and having a single integral part adapted to be attached to the engine."

Kane's structure and his contribution are described by appellant's counsel as follows:

"In this device the magneto and the igniter plug are no longer separated, but are brought into one unitary structure, with no link mechanism intervening between the movable electrode and the armature shaft. The spark plug has a flange, which is bolted against the engine cylinder, and this flange carries an integral arm on which the magneto and its associated mechanism are directly mounted. * * * The magneto and the spark plug and the co-operating mechanism are all part of a single unitary structure."

Again:

"When it is necessary to clean the spark plug or to test or adjust the mechanism, the whole unitary structure may be removed, and its operation

adjusted and its spark observed in the open, and it may then be put back on the engine with the absolute assurance that it will function in operative position, precisely as it did when removed from the engine."

Was it, then, assuming that Kane was the contributor of this advance, patentable novelty to provide the means whereby the generator was supported by an arm running from the spark plug? Or, in other words, having two elements in a machine which function together, was the mere fixture of the relative position of these two elements, invention? Unfortunately for appellee, the record contains some pertinent prior art citations. It is necessary to refer to but one, the patent to Weber, No. 820,535. This patent dealt with "an electric igniter and explosive engine." In the specification we find the following description:

"In order that the crank arm and the hammer arm may hold their relative positions with respect to each other intact, I prefer to mount the plate or board upon a horizontal bracket, the inner end of which is provided with a vertical flange secured rigidly to the igniter block."

In other words, this patent discloses an oscillating magneto, the parts of which are mounted upon and carried by the igniter block. It does not appear, however, that the support which operates in connection with the oscillating armature is integrally attached to the igniter block. But we are, in this instance, not interested in the manner of attachment. Rather must we direct our attention to the asserted patentable novelty residing in these two claims, 7 and 8, which novelty is limited to the mounting of the magneto generator upon the igniter block, so that the two may be removed or replaced as a single or unitary structure, thereby retaining the adjusted (and presumably proper) relation of the co-operating parts.

The fact that the Weber patent fails to disclose a mounting element integral with the igniter block is not sufficient to distinguish the citation, when it appears that Weber's two elements are rigidly secured together. In other words, it is quite immaterial whether the mounting of the generator upon the block is by a single piece, which is integral with the block, or by two pieces securely fastened together. The essence of the contribution was the *unitary structure* made possible by the rigidly and inseparably connected parts, the magneto generator, and the unitary block. Even if the Weber structure were to fail as a complete anticipation, because the generator is not *integrally* connected to the igniter block, and because the support aforementioned is not mounted upon the shaft which carries the generator, it nevertheless remains as a valuable citation of the prior art bearing on appellant's defense of invalidity. It sufficiently points the way to a unitary structure, so as to preclude any argument being successfully advanced that invention may be predicated upon the introduction of such an element connecting the generator and the plug.

Other prior art citations appear, and may well be referred to; but we are inclined to the view that invention is not disclosed, where the only contribution consists of uniting two co-operating elements such as are here disclosed. When once it was made to appear that in the removal of these parts their relation would or possibly might be broken and their predetermined adjustment disturbed, it required but the work of a me-

chanic to integrally connect them, so that synchronism would not be destroyed in their removal or in their replacement. We therefore refrain from further reference to the prior art citations. Certainly, with the teachings of Weber before us, the prima facie presumption of invention in Kane's contribution is overcome.

Claim 3 of the Kane patent reads as follows:

"3. In a device of the class described, the combination of a field magnet, an inductor mounted for oscillation within the field magnet, a pair of main actuating springs, *each connected at one end with the field magnet frame,* an integral yoke member *rigidly* connected with the inductor, *the main actuating springs being connected at their free ends with the said yoke member,* an operating arm constituting a part of the integral yoke member and adapted to be engaged by a reciprocating member driven by an internal combustion engine, separable contact points within the combustion chamber of the internal combustion engine, a light spring tending to maintain the closure of the electrical contacts, and mechanism adapted to be engaged by a cam surface on the yoke member to cause the separation of said contacts in opposition to the tension of the said light spring."

While its validity is also challenged for various reasons, our inquiry has been limited to the defense of noninfringement. The elements which we do not find in appellant's structure have been italicized. We have examined the record and the drawings, with the result that we agree with defendant's expert when he said:

"I am unable to find in defendant's type A device the structure, combination, set forth in claim 3 of the Kane patent in suit, * * * for the reason that the claim distinctly and definitely calls for its main actuating springs to be connected at one end with the field magnet frame, and for the reason that it definitely calls for the integral yoke member to be rigidly connected with the inductor, neither of which characteristics is true of defendants' type A device."

The same witness likewise distinguished appellant's type B, while the court held that its type C did not infringe this claim 3. Appellee does not dispute the distinction thus pointed out, but asserts that appellant's structure in the respects just alluded to is the mechanical equivalent thereof, and infringement is therefore shown. We are therefore called upon to determine what breadth we shall give to the claim—how strictly we shall hold patentee to the literal language of this claim.

Under the circumstances of this case, in view of the history disclosed by the files—the character of this claim—we conclude that appellant's structure is not the equivalent of that described by Kane in claim 3, and infringement does not appear.

The decree is reversed, with directions to dismiss.

## On Rehearing.

Edward Rector, of Chicago, Ill., and Charles L. Sturtevant and Eugene G. Mason, both of Washington, D. C., for appellant.

Lynn A. Williams, of Chicago, Ill., for appellee.

EVAN A. EVANS, Circuit Judge. A rehearing in this case was granted because of uncertainty as to the correctness of our conclusion respecting the validity of claims 7 and 8 of the Kane patent. In appellee's original brief the Kane invention was described as follows:

"At this juncture Mr. Kane invented the unitary magneto ignition equipment of his patent in suit. * * * In this device the magneto and the igniter

plug are no longer separated, but are brought into one unitary structure, with no link mechanism intervening between the movable electrode and the armature shaft. ✻ ✻ ✻ "

Speaking of its results, counsel said:

"When it is necessary to clean the spark plug, or to test or adjust the mechanism, the whole unitary structure may be removed, and its operation adjusted, and its spark observed in the open, and it may then be put back on the engine with absolute assurance that it will function in operative position precisely as it did when removed from the engine."

This position of counsel invited the observation of the court that:

"The essence of the contribution was the unitary structure made possible by the rigidly and inseparably connected parts, the magneto generator, and the unitary block."

The correctness of this position is now challenged because we failed to consider the effect of uniting in a single unitary structure *all* of the operating mechanism of the equipment, including, of course, the two elements aforementioned. We assumed, in determining the validity of the claim, that the Kane magneto ignition equipment was unitary in structure and permitted the operator to remove it from the engine, whereby it might be better examined and replaced, without changing the relative position of the two parts mentioned, and without disturbing the synchronism so much desired. We failed to appreciate fully what is now claimed as an important and valuable result, viz. the creation of a spark, when the equipment is off the engine, identical with the spark produced when it is on the engine. In other words, inspection is for the purpose of locating trouble, and trouble generally is located in the spark or in its absence. Obviously the spark which the mechanic or operator endeavors to produce off the engine must be such a spark as is produced ordinarily when the magneto equipment is in its place on the engine.

The claim provides for an integral support upon which *all of the aforesaid parts are mounted*. The words *"all of the aforesaid parts"* are not properly restricted to the magneto and igniter plug. Appellee now asserts that the Kane unitary equipment, when removed from the engine to be cleaned or tested, is capable of a satisfactory test, because it operates in precisely the same way to produce identically the same spark whether on or off the engine.

The question before us is one of patentability. While invention will not be determined by results obtainable, we have referred to the production of the spark on or off the engine to emphasize the use of the word "all" in the claims. Stressing, as we must, the provision which calls for the integral support upon which "all of the aforesaid parts are mounted," the question of patentability becomes a close one. We have, upon a consideration of all of the evidence (extent of use, the effect of allowance by the Patent Office, the decision of the district judge, the prior art, as well as all the other evidence), come to the conclusion that our first decision is incorrect, and that patentable novelty is here disclosed.

It would serve no useful purpose to elaborate upon the reasons that impel us to reach this conclusion. The question has been twice fully argued, and counsel have apparently appreciated the closeness of the

issue. Whether type of construction, manifested by size or location of parts, constitutes invention, must in the last analysis turn upon the facts in each particular case. Ordinarily, we might say, to construct a unitary structure without changing parts would not be invention. On the other hand, the unitary structure may have the parts so mounted as to result in a type or form so simple of operation or so handy and convenient in size or shape as to produce desirable results, which have been long, but unsuccessfully, sought by those skilled in the art. A finding, in support of which there is some evidence, that others skilled in the art failed after diligent effort to solve the problem, must, of course, be considered as rather persuasive in determining whether such advance constitutes invention.

Believing that we have erred in our previous conclusion, we avail ourselves of this opportunity to correct it. This conclusion respecting the patentable novelty back of claims 7 and 8 makes it necessary for us to consider one of the other defenses not heretofore considered by this court. In order to appreciate the defense of laches a more complete and detailed statement of the facts is necessary.

Kane's original application for patent No. 1,204,573 was filed February 2, 1910, and was allowed November 14, 1916. The divisional application was filed January 14, 1915, and allowed September 24, 1918. Milton's patent, No. 1,096,048, was applied for October 28, 1910, and allowed May 12, 1914. On August 17, 1915, the Milton patent was placed in interference with the pending Kane application, and Kane won. The circumstances under which this decision was obtained destroy its effect, and counsel for appellee do not rely upon the adjudication of the Patent Office in respect to the issue of priority, but rest upon the finding of the District Judge.

The Podlesak reissue patent, No. 13,878, was issued February 9, 1915, upon application filed December 23, 1914, the original patent being No. 1,055,076, issued March 4, 1913. Kane, by amendment filed April 17, 1915, introduced nine new claims; three being copies from the Podlesak original patent, and the remaining six from the reissue patent. These nine claims were rejected on various grounds, one of them being:

"That Kane had no right to make the claims in issue because of laches on his part, the claims not having been presented by him for more than two years after the issue of the original Podlesak patent, and not until some time after the issue of the reissued patent."

The Board of Examiners in Chief sustained Podlesak's contention, and it was held that the claims were barred by Kane's laches. Kane acquiesced in the decision with respect to three of the claims, which three claims correspond with those in Podlesak's original patent, but appealed to the Commissioner in respect to the remainder, the ones similar to those in the Podlesak reissue patent. The Commissioner affirmed the decision of the Examiners in Chief, but upon a different ground, viz. that the claims in question were not readable on Kane's disclosure. The Court of Appeals finally disposed of the matter against Kane, basing its decision both upon Kane's laches and upon the further ground that the claims were not readable upon Kane's disclosure. Following this decision, Kane, on June 17, 1918, filed an amendment, by which he

introduced the two new claims, 7 and 8, now in issue.  Kane's attorney, in presenting claims 7 and 8, stated to the Examiner:

"The decision of the Court of Appeals is, of course, binding upon the primary examiner to the effect that Kane is now estopped to make these specific detailed claims of the Podlesak patent because of his delay in so doing.  In so far as any prosecution of this application before the primary examiner is concerned [we properly concede that we are bound by the estoppel of res adjudicata and by the Court of Appeals].  It is clear, however, that this estoppel does not and cannot run as against the claims now presented. * * * The two claims presented herewith are not limited to any of these refinements or details."

It is upon the foregoing facts, and others hereinafter related, that we must dispose of the question of laches.  An inventor of a patent may lose his right thereto by waiver, by public grant, by estoppel, or by laches.  By failure to apply to the government for a patent within the statutory period of two years, he loses his right as effectively as if he made specific grant thereof to the public.  If in his application he seeks but a part of the claims to which he is entitled, he waives all right to those not claimed.  He makes a donation to the public, and his right to the monopoly is gone forever.  While the results are the same, there is, of course, a difference in the evidence which shows a grant to the public and the evidence which supports the defense of laches.

[3] In support of the contention that section 4886, R. S. (Comp. St. § 9430), requires a divisional application to be filed within two years from the allowance and publication of a patent covering the same claims, appellant cites Chapman v. Wintroath, 252 U. S. 126, 40 Sup. Ct. 234, 64 L. Ed. 491.  Subsequent to the filing of the original brief the following additional authorities were submitted, all based upon the views expressed in Chapman v. Wintroath; De Ferranti v. Harmatta, 50 App. D. C. 393, 273 Fed. 357; Ransdall v. Jahns, —— App. D. C. ——, 273 Fed. 365; Replogle v. Kirby, 50 App. D. C. 210, 269 Fed. 862; Wells v. Honigmann, 50 App. D. C. 99, 267 Fed. 743.  Our attention has been called to no case holding the contrary, and we have found none upon independent investigation.

True, the precise question here presented was not squarely raised, and therefore not decided, in Chapman v. Wintroath.  In that case the divisional application was denied (no hearing was had, and no evidence was received) solely on the ground that it was not made within *one year* from the date of the allowance of a patent covering the same claims to another.  Appellants contend, however, and we agree with the courts that have passed upon the question, that the effect of the holding is to fix the period during which such application must be filed at *two* years from the date of the issuances of the other patent.  No other deduction can fairly or logically be drawn from the discussion of the question in that opinion.  In fact, this was the effect of the holding upon the nine claims that Kane copied from the Podlesak patent, all of which were rejected because not timely made, and to which ruling appellee acquiesced.

The facts in the present suit are distinguishable from the Chapman Case, in that the claims were not identical with any claims in any issued patent.  While this distinction may be made, it appears that the difference does not justify a different conclusion being reached.  The

claims in question differ only in that they are more broad, more generic, than the specific claims that were rejected in the interference contest. But we are not required to rest our decision solely upon the two-year period fixed by the statute. Laches may arise and become an effective bar to relief under a variety of circumstances. Laches is based upon delay, and delay is a relative term. In the last paragraph of the opinion in Chapman v. Wintroath we find the court referring to laches other than that defined and fixed by the statute, by calling attention to the absence of any evidence in the case under consideration that would warrant any such finding. The court says:

"As has been pointed out, the Examiner of Interferences did not permit the introduction of any evidence with respect to laches or abandonment and the Court of Appeals rests its judgment, as he did, wholly upon the delay of the Chapmans in filing their divisional application for more than one year after the Wintroath patent was issued, as this appeared 'on the face of the record.' While not intending to intimate that there may not be abandonment which might bar an application within the two-year period allowed for filing, yet upon this discussion of the statutes and decisions we cannot doubt that, upon the case disclosed in this record, the Chapmans were within their legal rights in filing their divisional application at any time within two years after the publication of the Wintroath patent, and therefore the judgment of the Court of Appeals must be reversed."

Turning to the facts in the present case, and for the moment ignoring any two-year rule, we find Kane's position in support of claims 7 and 8 untenable. Not only did he not intend to make these claims, in fact he knowingly and intentionally failed to present them, but not until eight years after he filed his original application, and more than nine years after the device was in common use, during all of which time it was in general use, did he seek to dominate the art by inserting these amended claims into the patent. When examined as to the new combination represented by these two claims, he testified that he had knowingly failed to claim it. The following testimony appears:

"Q. What? Didn't Mr. Webster ask you to help him out in connection with the means of fastening the magneto and the plug to the engine? A. No, sir; he did not.

"Q. He didn't discuss that at all with you prior to the time that you filed your application? A. He did prior to the time we filed the application.

"Q. Well, when was it he discussed that with you? A. Discussed that with me when I showed him the drawing.

"Q. Mr. Kane, is there anything on that drawing—the first one that you had—showing any means of regulating or determining what you call the cut-out of the spark? A. No, sir; there is not. * * *

"Q. Now, what did you tell him about the means by which the magneto and plug were to be attached to the cylinder? A. Well, outside of telling him that by doing that we had a means of securely fastening the magneto to the cylinder, and also a means of cutting out a lot of intermediate and useless mechanism, I do not know as I told him very much.

"Q. You did not consider it of very much importance; is that right? A. It seemed to me a matter more of design than importance—invention.

"Q. Is that what you told him? A. Yes, sir.

"Q. And you told him that you thought that it was not an invention, and was a mere matter of design? You told that to Mr. Sprinkle, did you, when you went to him to get a patent? A. I told him it was a good means and preferred means of fastening the magneto on the engine.

"Q. Well, I asked you if you told him that you thought it was a mere matter of design, and not an invention. A. I possibly did; yes."

Believing that the Podlesak invention was controlled through contract and otherwise, appellee was not greatly concerned about the question of who was the first inventor. Its attitude in the Milton-Kane contest is not such as to invite the court's confidence in the sincerity of its protestations nor in the good faith of its assertion that it was not endeavoring to improperly prolong its monopoly beyond the period fixed by statute. Having secured a favorable decision from the Patent Office in this interference contest through control and ownership of both sides of the litigation, it then discovered that its asserted rights under its patent and under its contract with Podlesak were challenged, and it again amended its specifications, inserting the new claims which necessitated an interference contest with Podlesak. This contest was bitterly fought, appeals being taken from the Examiner, and then to the Patent Commissioner, and then to the Court of Appeals, with the result that appellee was found guilty of laches and the decision went against it.

Appellee filed the aforementioned amended application incorporating these nine new claims on April 17, 1915; the first three were taken from the Podlesak patent, issued March 4, 1913, and the other six from the Podlesak reissue patent, dated February 9, 1915. In this adverse decision appellee acquiesced, wherefrom it appears that, if appellee was guilty of laches in April, 1915, for failure to present the nine claims under consideration, it must a fortiori be found guilty of laches in failing to present claims 7 and 8 until June 17, 1918. The allowance of these last two claims upon the amendment of June 17, 1918, was upon ex parte application and was made by the Examiner; the adverse parties, of course, not being present to protest or point out the error of such allowance. The claims differ, as heretofore stated, from the claims in the Podlesak patent, in that they are broader in scope, but the difference is not sufficient to avoid the effect of the decision in the Podlesak interference contest. They depend for their support largely, if not entirely, upon that part of the specifications which were incorporated by amendment in 1915, which amendment was made to support the nine claims taken from the Podlesak patent and subsequently rejected as heretofore described. We conclude Kane's laches barred his right to claims 7 and 8.

The decree is reversed, with directions to dismiss the bill.

⬅➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes