**John A. BOTT, an individual and Jac Products, Inc., a Michigan corporation, Plaintiffs,**

v.

**FOUR STAR CORPORATION, a Michigan corporation, Defendant.**

**Civ. No. 86–70176.**

United States District Court, E.D. Michigan, S.D.

Feb. 23, 1987.

Jeffrey Sadowski, Birmingham, Mich., for plaintiffs.

Allen Krass, Troy, Mich., for defendant.

## OPINION

COHN, District Judge.

### I.

This is a patent case. Plaintiff, John Bott (Bott), is the owner of U.S. Patent No. 4,099,658 (the '658 patent), U.S. Patent No. 4,182,471 (the '471 patent) and U.S. Patent No. 4,516,710 (the '710 patent). The patents-in-suit disclose an article carrier, commonly called a luggage rack, for an automobile vehicle. The '658 and the '471 patents disclose a removable rack while the '710 patent discloses a nonremovable rack. The term of each patent expires April 5, 1994 by virtue of terminal disclaimers.

Defendant Four Star Corporation (Four Star) currently manufactures and sells to American Motors Corporation (AMC) a nonremovable rack that Bott alleges infringes the '658 and '471 patents by equivalents and literally infringes the '710 patent. Earlier, Four Star manufactured and sold to AMC a removable rack that I found infringed the '658 and '471 patents. *See Bott v. Four Star Corp.*, 218 U.S.P.Q. 358 (1983), *aff'd without opinion*, 732 F.2d 168 (Fed.Cir.1984) (liability), and 229 U.S.P.Q. 241 (1985), *aff'd in relevant part*, 807 F.2d 1567 (Fed.Cir.1986) (damages) (*Bott I*). I also found in *Bott I* that Four Star's nonremovable rack likely did not infringe the '658 and '471 patents, at least literally.

*See Memorandum And Order On Contempt Motion* (Feb. 26, 1985).

Bott filed this case on January 14, 1986 alleging infringement of the '710 patent. Four Star's answer raised a number of defenses including double patenting, abandonment, intentional delay of prosecution, and equitable estoppel. On December 18, 1986, I entered an order bifurcating the issue of equitable estoppel and setting it down for immediate trial. *See Order Bifurcating Affirmative Defense Of Estoppel* (Dec. 18, 1986). Plaintiff amended his complaint to add claims of infringement of the '658 and '471 patents on January 12, 1987. On four days at the end of January of this year, I tried the issue of equitable estoppel.

### II.

#### A.

Four Star's defense of equitable estoppel can be outlined as follows:

—the '710 patent is the end of a chain of patent applications beginning with an application filed on July 8, 1974 followed by abandonments, continuation applications, divisional applications, and issued patents including the '658 and '471 patents.

—in the initial application before it was abandoned a claim comparable in scope to the claims of the '710 patent was deemed allowed. Likewise, additional claims comparable in scope to the claims of the '710 patent were presented to the Patent Office in the early stages of the chain leading to the '710 patent.

—not until the filing of the application for the '710 patent in November of 1983 did a claim comparable in scope to these early claims reappear in the chain.

—following the finding of infringement in *Bott I*, and in reliance on the fact that Bott did not assert any claim to a nonremovable rack in the chain, Four Star legitimately designed around the '658 and '471 patents by developing a nonremovable rack so that it could continue to do business with AMC.

The parties stipulated to most of the facts at trial. Disputed and determinative on the issue of equitable estoppel are: (1) Bott's conduct in the Patent Office in prosecuting the chain and the manner in which Bott conducted *Bott I;* (2) Four Star's knowledge of Bott's conduct; (3) Four Star's reliance on Bott's conduct; and (4) Four Star's right to rely on Bott's conduct.

### B.

Equitable estoppel is a factually dependent affirmative defense. Fed.R.Civ.P. 8(c); 28 Am.Jur.2d, *Estoppel and Waiver* §§ 135, 141–42 (1966). As explained by Chief Judge Pratt, to work an estoppel a defendant must show, in addition to laches, that it was misled in some fashion by the plaintiff by either misrepresentation, affirmative acts of misconduct, or intentionally misleading silence. *MGA, Inc. v. Centri–Spray Corp.*, 639 F.Supp. 1238, 1244 (E.D.Mich.1986), citing *Watkins v. Northwestern Ohio Tractor Pullers Ass'n, Inc.*, 630 F.2d 1155, 1160 (6th Cir.1980), and *TWM Mfg. Co., Inc. v. Dura Corp.*, 592 F.2d 346, 350 (6th Cir.1979); *see also Dickerson v. Colgrove*, 100 U.S. (10 Otto) 578, 25 L.Ed. 618 (1879).

Given the history of the '710 patent and the development of Four Star's nonremovable rack, I cannot say that Four Star was misled by Bott's conduct. Four Star knew or should have known that Bott was likely in a position to obtain a patent on a nonremovable rack at the time it attempted to design around the '658 and '471 patents. However egregious may have been Bott's prosecution of the chain of patents since 1974, Four Star has not established its right to rely on Bott not applying for and receiving a patent on a nonremovable rack having a 1974 priority date. The patent statute, 35 U.S.C. §§ 120 and 121, as well as the rules of the Patent Office, particularly Rule 60, 37 C.F.R. § 1.60, permit the chaining of applications, abandonments, continuations, and divisions present here without limitation as to number.

The rule that applications may be chained in the Bott manner is not new. *See* William C. Robinson, *The Law of Patents for Useful Inventions* § 581 (1890) (substituted applications are continuations of the original and bear its date). Nothing in the case law is to the contrary. *See, e.g., Hughes Aircraft v. United States,* 717 F.2d 1351 (Fed.Cir.1983) (amendment of claims is a common practice; the effect of an amendment may or may not be fatal to application of a range of equivalents broad enough to encompass an accused product); *Square Liner 360°, Inc. v. Chisum,* 691 F.2d 362 (8th Cir.1982) (a proper continuation application and its parent are considered parts of the same transaction and constitute one continuous application); *Application of Hogan,* 559 F.2d 595 (C.C.P.A. 1977) (rights under patent law are questions of statute and not natural rights), quoting *United States v. American Bell Telephone Co.,* 167 U.S. 224, 247, 17 S.Ct. 809, 813, 42 L.Ed. 144 (1897); *Application of Henriksen,* 399 F.2d 253 (C.C.P.A.1968) (there is no arbitrary limit to the number of prior applications through which a chain of copendency may be traced to obtain the benefit of the filing date of the earliest application in the chain provided that all of the other statutory conditions are met); *Ex parte Hull,* 191 U.S.P.Q. 157 (P.T.O.B.A. 1975) (the number of continuation applications to avoid divulging a basic invention is not determinative of legality; it is the overall conduct of the applicant that is determinative); *see also* 2 D. Dunner, J. Gambrell, M. Adelman, C. Lipsey & B. Lewris *Patent Law Perspectives* § 3.5[1], at 3–42.1–.4 (2d ed. 1980) (discussion of public review of a file history and subsequent action).

Four Star's reliance on *Webster Electric Company v. Splitdorf Electric Company,* 264 U.S. 463, 44 S.Ct. 342, 68 L.Ed. 792 (1924), is misplaced. There, the Supreme Court dealt with a patent holder's conduct in the Patent Office and consequences that "subvert[ed] ... [the] limitations [of the patent law, which brought] about an undue extension of the patent monopoly against private and public rights." *Id.* at 466, 44 S.Ct. at 343. More particularly, in *Webster* the claims at issue were presented for the first time to the Patent Office by an amendment to a divisional application eight years and four months after the filing of

the original application. The patent holder originally did not intend to assert the claims; the intention to do so was not entertained until three months before the patent-in-suit issued. *See* 283 F. 83, 94 (7th Cir.1922). During all the prior time, the subject matter of the claims was disclosed and in general use. The patent holder simply stood by and awaited developments. This was a case of unreasonable delay and neglect on the part of an applicant in bringing forth claims broader than the claims originally sought. The effect of enforcing the claims was an extension of the monopoly. Since there was no reason not to describe the subject matter of the claims substantially earlier in the chain, even in the original application, the patent was held invalid. Here, Bott's eleventh-hour filing of a terminal disclaimer, as will be described, on the '710 patent (in response to Four Star's motion for summary judgment) eliminates any "undue extension of the patent monopoly." *See also Bott I*, 218 U.S.P. Q. at 372 n. 77.

## III.

My findings, together with the conclusions expressed in this opinion, constitute the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a). The findings, based on the stipulated facts, the testimony and exhibits at trial, as well as my judicial notice of the proceedings in *Bott I*, are divided into two parts: the history of the '710 patent and the history of Four Star's efforts to develop a nonremovable rack. In making these findings, I have considered the ability and opportunity of each witness to observe the matters about which the witness testified, the manner of each witness while testifying, the interest, bias or prejudice, if any, of each witness, and all the other evidence in the case in determining credibility and the weight to be given to the evidence.

### A. History of the '710 Patent

1. On July 8, 1974, Hugh Harness of Harness, Dickey & Pierce prepared and filed on behalf of Bott S.N. 486,415. Claim 15 in the application was comparable in scope to the claims of the '710 patent.

2. H. Keith Miller assumed responsibility for Bott's patent work in 1975 when Harness left the practice of law. Miller, on behalf of Bott, on March 15, 1976, filed an amended Claim 15. This claim was deemed allowable by the Patent Office on June 22, 1976.

3. Earlier, on November 6, 1974, an amendment to S.N. 486,415 included new Claims 19 and 24 that were broader in scope than the claims of the '710 patent. Claims 19 and 24 defined a rack in a sufficiently broad manner to read on Four Star's nonremovable rack and did not include the words " 'removable' or 'detachable' or the like." * Claims 19 and 24 were amended on March 15, 1976 and were rejected on June 22, 1976.

4. On November 22, 1976, Miller had a choice of allowing S.N. 486,415 to issue with a limited number of claims or abandoning it. Miller chose to abandon the application and file a continuation application. Miller saw no useful purpose in having a patent for a rack issue at that time. While Miller stated he wanted to prosecute an application using his own claim format, Miller was primarily motivated by a concern that the statutory seventeen-year period would begin to run when Bott had no competition and had no commercial need for a rack embodying his invention. Miller viewed his reasons for abandonment as a permissible practice.

5. On November 22, 1976, Miller, on behalf of Bott, prepared and filed a continuation application, S.N. 743,602, prior to abandoning S.N. 486,415. Claims 19 and 21 of the application lacked limitations addressed to removability. There is no testimony explaining the boundaries of Claims 15, 19, and 24 of the first application or Claims 19 and 21 of the second application, or how these claims relate to each other or to the claims of the '710 patent other than as stated above.

6. On December 21, 1977, following Bott's awareness of Four Star's activities

---

\* This language comes from the statement of undisputed facts (No. 29) filed by Four Star.

at Ford Motor Company (Ford), Bott filed a Petition to Make Special as explained in *Bott I,* 218 U.S.P.Q. at 360 & n. 11, 374. Following a meeting with an examiner, Miller, on behalf of Bott, filed an amendment to S.N. 743,602 cancelling the pending claims, 19–39, and adding three new claims more limited in scope to a removable rack and covering the Four Star rack that Bott had seen at Ford. The examiner had advised Miller that these new claims, 40–42, would be deemed allowable if a terminal disclaimer were filed. Miller does not recall discussing the cancelled claims or why he gave up (at least temporarily) a claim that had been deemed allowable. In the amendment, Miller said:

It is to be noted that the applicant's canceling of claims 19–39 has been made without prejudice toward the applicant's filing one or more voluntary divisional applications toward the subject matter not specifically claimed in claims 40–42 and additionally, the Examiner has indicated that the applicant's attorneys are entitled to file dependent claims which further define the applicant's invention, in the immediate future.

The '658 patent issued on July 11, 1978.

7. Thereafter, Miller, on behalf of Bott, filed a series of continuation applications or divisionals in a direct line, all having July 8, 1974 as the basis of a claim of priority, as follows:

| Serial No. | Date Filed | Type | Patent No. | Date |
|---|---|---|---|---|
| 924,072 | 7/7/78 | Divisional | 4,182,471 | 1/8/80 |
| 56,373 | 7/10/79 | Abandoned | | |
| 242,138 | 3/9/81 | Abandoned | | |
| 485,859 | 4/18/83 | Continuation | 4,440,333 | 4/3/84 |

8. In addition, the following patent activity by Bott took place along collateral lines with July 8, 1974 as the basis of a claim of priority:

| Serial No. | Date Filed | Type | Patent No. | Date |
|---|---|---|---|---|
| 604,643 | 8/14/75 | Continuation in Part of S.N.486,415 | 4,055,284 | 10/25/77 |
| 779,521 | 3/21/77 | Division of S.N.604,643 | 4,170,332 | 10/9/79 |
| 56,154 | 7/10/79 | Division of S.N.924,072 | 4,295,587 | 10/20/81 |
| 443,024 | 11/19/82 | Continuation of S.N.242,138 | 4,427,141 | 1/24/84 |
| 485,858 | 4/18/83 | Continuation of S.N.242,138 | 4,431,123 | 2/14/84 |

9. On November 23, 1983, Miller, on behalf of Bott, filed S.N. 554,683 as a continuation of S.N. 485,859. This is the first application in the chain that included broad claims, comparable to Claim 15 in S.N. 486,-415 and Claims 19 and 21 in S.N. 743,602, covering a nonremovable rack. Bott himself knew of no reason for the delay. He relied completely on his lawyers and placed no restrictions, financial or otherwise, on them. The first time Bott discussed with anyone the nonremovable rack was when he saw Four Star's AMC rack. It is Miller's view that the delay was simply a matter of priorities; other matters were more pressing. Market circumstances dictated Miller's priorities; since there was no pressing need to obtain coverage on a nonremovable rack, an application for such an embodiment was not filed. Four Star's inevitable design-around effort was likely a factor in Miller's decision in proceeding with S.N. 554,683. Miller also knew it would be advantageous to Bott to be in a position where a new application could be filed.

10. Miller and Jeffrey Sadowski, Miller's partner who worked on Bott patent matters, knew in September of 1983 that the claims of the three patents issued in early 1984 had been allowed. They then sat down to write S.N. 554,683. Precisely when Miller and Sadowski began to work on the application is not clear. Neither of them can remember the exact date, and they have no office records to assist them. (Throughout, Miller's memory and Harness, Dickey & Pierce's records leave much to be desired. Miller's lack of memory and the absence of corroborative office records are inconsistent with the generally metic-

ulous manner in which patent law firms and lawyers traditionally operate.)

11. Miller testified (T89):

Q. You wanted to get claims which would hopefully block them [Four Star] in in as many of those ways as possible, is that correct?

A. I'm sure that was a consideration. It wasn't a predominant one. There was invention there and we thought it was a good invention that we ought to try and protect before the entire prosecution came to a close.

12. Claims 19–39, which were cancelled in S.N. 743,602 on December 21, 1977, reappeared in subsequent applications for such features as eyelets and end caps, slot structure and configuration of the grooves, as well as locking mechanisms. Nonremovability was the last feature of the cancelled claims that Bott, through Miller, elected to pursue even though a nonremovable rack encompasses the broadest claims in the chain following the initial application.

13. The ancestral tree of the '710 patent is displayed in Dxl; the direct ancestry part is displayed in attached Exhibit A. Dxl demonstrates the prolific nature of Bott's patent activity with regard to roof racks as well as the particular nature of the applications and patents in the ancestral tree. As seen from Exhibit A, patents issued to Bott having July 8, 1974 as the basis of a claim of priority as follows:

| Patent No. | Date |
|---|---|
| 4,055,284 | October 25, 1977 |
| 4,099,658 | July 11, 1978 |
| 4,170,322 | October 9, 1979 |
| 4,182,471 | January 8, 1980 |
| 4,295,587 | October 20, 1981 |
| 4,427,141 | January 24, 1984 |
| 4,431,123 | February 14, 1984 |
| 4,440,333 | April 3, 1984 |

As each patent was issued, its file wrapper, as well as the file wrappers of applications of abandoned applications not previously available, became available for public inspection.

14. While the ancestral history, as it became available prior to the issuance of the '710 patent, disclosed no attempt by Bott to assert claims for a nonremovable rack, it also disclosed that Bott was continuing to keep the chain of applications alive to maintain the July 8, 1974 priority date for various embodiments of his basic invention.

15. The '710 patent issued on May 14, 1985. It included a terminal disclaimer for the term beyond U.S. Patent No. 4,440,333 issued to Bott on April 3, 1984. This case was filed January 14, 1986. Four Star filed a motion for summary judgment on July 2, 1986 on the ground (among others) of double patenting against the '658 and '471 patents. Bott's response to the motion on July 15, 1986 indicated he was filing a terminal disclaimer (actually filed with the Patent Office the next day) disclaiming the term beyond an earlier Bott patent, U.S. Patent No. 4,015,760 issued on April 5, 1977. The terms of the '658 and '471 patents were previously disclaimed by Bott beyond the expiration of the term of this patent. Therefore the term of the '710 patent expires on April 5, 1994. The belated filing of the terminal disclaimer does not injure Four Star. (See transcript of August 22, 1986 argument on Four Star's motion for summary judgment.)

16. In summary, between December 21, 1977 and November 23, 1983, a period of six years, Miller, on behalf of Bott, filed at least seven patent applications relying for priority on July 8, 1974, the original filing date, and claiming various aspects of racks as described above. None of these applications contained claims that were comparable in scope to the claims of the '710 patent in the manner described in paragraph 3 above. Four of these applications resulted in issued patents. The file histories contain no explanation for the hiatus.

B. History of Four Star's Nonremovable Roof Racks

1. In January of 1983, following completion of the proofs on liability in *Bott I*, I notified the parties that I intended to find that the '658 and '471 patents were valid and infringed by the removable racks being manufactured by Four Star. At that time, AMC was Four Star's principal customer for racks. On April 11, 1983, I issued my opinion describing in detail my findings and

conclusions including particular emphasis on the removability feature of Bott's invention. I stated: "Its essential features are its attractiveness, adjustability and removability." 218 U.S.P.Q. at 365. I then entered an order staying injunctive relief. This allowed Four Star to continue business with AMC. Four Star appealed.

2. The AMC business was important to Four Star. Four Star, as to be expected, immediately began an effort to design around the '658 and the '471 patents. In the spring of 1983, Ernie Brooks, Four Star's attorney in *Bott I*, suggested that a nonremovable rack likely would not infringe. Brooks had an awareness of the file histories of the '658 and the '471 patents and was generally aware that more than one claim in the prosecution history not limited to a removable configuration had been cancelled. Brooks, however, had no specific recollection of the cancellation of any particular claim, and there is no evidence that he reexamined the available file wrappers in the chain prior to making his suggestion. (See Paragraph 10 below.)

3. On September 23, 1980 in *Bott I*, Bott answered an interrogatory as follows:
INTERROGATORY [29] (s)
    Identify all other patents and patent applications (worldwide) owned or controlled by the Plaintiff or any company identified in response to 1(a) above relating to the subject matter of the Patents, irrespective of when, where and by whom filed.
RESPONSE:
    Objection is made to the above interrogatory as irrelevant, outside of those already identified in Interrogatory 2(n) above, and unduly burdensome and oppressive to compile and identify, particularly in light of the lack of relevance thereof.

4. The interrogatory was proper. The answer was dissembling. Four Star did not follow up on the answer. Information as to pending patent applications is important in patent litigation; such applications may contain admissions. The information is not privileged. While a proper answer would not have disclosed a pending applica-

tion for a nonremovable rack, it would have disclosed a continuation in the chain of applications and that there had been no follow-up to Claim 15 of S.N. 486,415 or Claims 19 and 21 of S.N. 743,602. On the other hand, by September 23, 1980, Bott had already received four patents tracing their ancestry to S.N. 486,415 and Four Star had no right to assume that the chain of applications had come to an end. The answer to the interrogatory in fact suggested that the chain was continuing.

5. On November 21, 1983, Brooks wrote Four Star that affirmance of my decision by the Court of Appeals for the Federal Circuit was likely and urged Four Star to continue its efforts on a nonremovable rack.

6. By March of 1984, Four Star had made substantial progress in persuading AMC to accept a nonremovable rack. AMC had concerns over the use of a nonremovable rack; because of an indemnity from Four Star, it had no concerns over infringement.

7. In March of 1984, Four Star received an infusion of new capital of approximately $2.4 million in the form of stock and loans. The financing documents included the opinion of unidentified counsel that referenced the appeal in *Bott I*:
    Should the Company lose the appeal, it will be enjoined from producing and selling the Fiat Rack. The customer has authorized modifications to the Fiat Rack which the Company believes would eliminate any infringement upon Bott's patents. The customer would continue to purchase the Fiat Rack, as modified. Monetary damages are yet to be determined, but the Company has made provision for payment of same should it be necessary. See Financial Statements for Year Ended August 31, 1983, notes 1 and 11.
This was an unrealistic view of Four Star's situation at the time. Footnote 11 shows that Four Star reserved a relatively modest amount for a possible damage award. This suggests Four Star believed its liability as an infringer likely would be limited to be-

ing required to pay a royalty on infringing sales in the area of three percent.

8. On March 21, 1984, the Court of Appeals for the Federal Circuit affirmed my decision, noting: "The article carriers can be removed to leave only unobtrusive low profile slats...." The opinion was equivocal since it recognized the possibility of a continued claim by Bott of infringement, presumably on grounds of equivalents. On April 12, 1984, Brooks for the first and only time gave Four Star a written opinion on the nonremovable rack stating that Four Star was "safe in relying on limitations in the claims requiring 'removable' cross rails."

9. Brooks, in his opinion, did not mention the file wrapper histories of the Bott patents. He was satisfied that the 1974 application had yielded all it could. He testified (T 123):

Q. Are you saying that at that time in '83 you assumed that Bott was no longer pursuing claims to the nonremovable rack?

A. Allen, I didn't assume it. I knew it. I was wrong, obviously. I haven't checked to see where I was in error. I knew there was nothing continuing. I wasn't told of it. I didn't get it in discovery. I was never apprised of any continuing requirements. You go back to the question of the common invention, the two patents on one invention were enough, in my view, and surely if there had been three or four or something continuing I would have been given it in discovery, and it was with that record and that confidence that I knew there had been nothing else. I looked. We asked for production. We had never been given anything but I was wrong.

Q. You were wrong in assuming that the answer you got to your request for production indicating that there was nothing relevant pending?

A. I haven't figured out where I was wrong. I was wrong in my understanding that there could be no further patent of a different scope.

10. Brooks was not aware of any further Bott patents, including the three pat-

ents issued in January, February, and April of 1984, which trace their ancestry to the 1974 application. Additionally, Brooks had no recollection that the Patent Office had once approved a claim comparable in scope to the nonremovable rack that Four Star intended to sell MAC. Brooks's specific testimony on his recollection follows:

I was aware of the fact that more than one claim, and claim 21 is one of them, were not limited to removable configuration. Those claims were all cancelled. (T 111–112)

....

I don't have a specific recollection at this time on the cancellation of any claim at the time of the design around.... My understanding with respect to all of the claims that had been cancelled was that the cancelling was a prerequisite to the grant of the two patents that it litigated. (T 117)

....

Q. Do you have any recollection, taking into account your opinion of Exhibit 18 that the patent office had already granted claims of the scope of the ... modified rack that you were offering to AMC?

A. No, I don't have any such recollection. (T 161)

Brooks was knowledgeable about late claiming and abusive Patent Office practice. This defense was raised in *Bott I.* *See* 218 U.S.P.Q. at 372 n. 77, 374–76.

11. In May of 1984, Bott first learned of Four Star's intentions to sell a nonremovable rack to AMC. At that time in discussing settlement of *Bott I,* Bott and Four Star talked about a license to Four Star under the '658 and '471 patents. Bott took the position that a nonremovable rack literally and by equivalents infringed the '658 and '471 patents. Bott, in his discussion with Four Star, did not mention his pending application for a patent on a nonremovable rack.

12. Four Star began deliveries of its new rack to AMC in June of 1984. On

September 18, 1984, following a breakdown of the settlement negotiations, the stay of injunctive relief against Four Star was lifted. On October 12, 1984, Bott filed a motion in *Bott I* to hold Four Star in contempt on the sale of the nonremovable rack to AMC on the ground that all Four Star did in designing around was to install a "modified removable end cap." On February 26, 1985, I denied the motion. Bott said nothing in the course of the contempt proceeding regarding his application for a patent on the nonremovable rack.

13. On December 28, 1984 during the contempt proceeding (and prior to any determination of damages), Four Star obtained an additional $750,000 infusion of capital in the form of loans. As part of the financing, Four Star received a brief opinion by Bernard Cantor (Cantor), the attorney then representing it in the contempt proceeding and the damage phase of *Bott I*, to the effect that the manufacture and sale of the new rack "does not infringe" on Bott's '658 and '471 patents and "is outside of the scope of the injunction." The opinion related to a nonremovable rack held in position by a metal stake and not to the form of rack being sold to AMC, which was held in place by torx-headed screws.

14. There is no evidence that Cantor examined the file histories of the previously issued Bott patents or had any familiarity with S.N. 486,415 or S.N. 743,602 or took into account the possibility that a continuation application was pending in the Patent Office. Cantor did not testify at trial.

15. Ralph Mandarino (Mandarino) has been the chief executive officer of Four Star since September of 1982. He was continuously briefed on the progress of *Bott I* since that date and directly involved in the Four Star–AMC relationship. At no time was continuation practice in the Patent Office explained to him. Mandarino was satisfied that as long as Four Star manufactured and sold a nonremovable rack to AMC it would escape a charge of infringement. Mandarino knew that Brooks had advised him of the likelihood of Bott asserting that Four Star's new rack infringed the '658 and the '471 patents.

16. Mandarino believed that Four Star's risk on being found to infringe in its manufacture and sale of the nonremovable rack was to pay in the area of three percent royalty on sales. Since Four Star was making in excess of twenty percent on its sales to Four Star, the risk was worth taking. Mandarino took the same approach in continuing infringing sales to AMC after Four Star was found to be an infringer in *Bott I* and particularly in the March–June, 1984 period after affirmance of my opinion in *Bott I* by the Court of Appeals.

## IV.

It should be remembered that the trial under the December 18, 1986 order was not a trial on the issues of double patenting, file wrapper estoppel, abandonment, or intentional delay of prosecution. While the evidence may warrant a finding of intentional delay based on circumstantial evidence that Miller purposefully prolonged the chain, such a finding is not the same as a finding that Four Star has established an equitable estoppel.

Four Star had the right to design around the '658 and the '471 patents. 2 Peter D. Rosenberg, *Patent Law Fundamentals* § 14.09 (2d ed. 1986). Four Star argues that in the course of its effort to design around, Four Star knew from the file histories that Bott had originally filed claims without the removability feature, had cancelled them and not resubmitted claims of comparable scope in succeeding applications, and that no patent issued to Bott covering the nonremovable rack in nine years. However, Four Star did not carry its burden in proving this or, that if it did know, it relied on Bott's conduct. What the proofs show is that Four Star did not pay any significant attention to the file histories of the Bott patents. It did not prove that its attorneys examined the file histories to come to a reasoned conclusion that Bott had abandoned any effort at obtaining a patent on a nonremovable embodiment of his invention. What the proofs show is that Four Star's attorneys ignored

the likelihood that after the issuance of the '471 patent the chain continued.

Whatever the importance to the proper operation of the patent system of the public being able to determine the limits of the protection granted to a patentee by denying a patentee the right to cancel broad claims and then reassert them many years later in a continuing chain, as argued by Four Star, that public policy issue is not for me to decide at this time. Also, the public policy issues implicated by the defense of intentional delay are not for me to decide now. The question faced by Four Star in its design-around effort was not the limits of protection afforded Bott by his issued patents but whether Bott was in a position to obtain a patent on a nonremovable rack. He was. Four Star ignored this possibility even though there were "footprints in the sand." Robinson Crusoe knew of Friday's presence even though he could not see him; Four Star should have known of the likelihood of the '710 patent even though it was not aware of S.N. 554,683.

Bott shall submit an appropriate form of judgment on notice.

The deputy clerk shall schedule a status conference to determine the future course of this case.